IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2022

## JERRY BURKES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Greene County**
**No. 20CR286     Alex E. Pearson, Judge**

_____

**No. E2021-00861-CCA-R3-PC**

_____

The Petitioner, Jerry Burkes, appeals from the Greene County Criminal Court's denial of his petition for post-conviction relief from his convictions for money laundering, theft of property valued at $60,000 or more, and twelve counts of sales tax evasion. On appeal, he argues he received ineffective assistance of appellate counsel. The Petitioner also contends that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by withholding records relevant to his tax liability; that he was convicted upon an invalid presentment; that he was deprived of a fair and impartial grand jury in violation of the Fourteenth Amendment; that the trial court admitted evidence at trial in violation of Tennessee Rule of Evidence 404(b); and that the evidence is insufficient to sustain his conviction for money laundering.[1] After reviewing the record, we conclude that the Petitioner failed to establish that he received ineffective assistance from appellate counsel and that the remainder of the Petitioner's claims have been previously determined, waived, or do not entitle him to relief. Accordingly, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Jerry Burkes, Wartburg, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Ritchie Collins and Cecil C. Mills, Jr., Assistant District Attorneys General, for the Appellee, State of Tennessee.

_____

[1] We have reordered the Petitioner's issues for clarity.

## OPINION

**Facts and Procedural History.** In March 2014, the Greene County Grand jury issued a presentment charging the Petitioner with eleven counts of money laundering, one count of forgery, one count of theft of property valued at $60,000 or more, and twelve counts of sales tax evasion. State v. Jerry Reginald Burkes, No. E2017-00079-CCA-R3-CD, 2018 WL 2194013, at *1 (Tenn. Crim. App. May 14, 2018). After the trial court expressed concern about the validity of the presentment, the State obtained a superseding presentment in November 2014 charging the Petitioner with one count of money laundering, one count of forgery, one count of theft of property valued at $60,000 or more, and twelve counts of sales tax evasion. Id. Prior to trial, the State dismissed the forgery count. Id. at *3 n.3.

Although the trial court initially appointed the public defender's office to represent the Petitioner prior to and at trial, the Petitioner terminated his public defender and asserted his constitutional right to represent himself. At that time, the trial court appointed elbow counsel to assist the Petitioner as he proceeded pro se, and the Petitioner later filed a motion requesting that elbow counsel be removed. The trial court removed elbow counsel, and the Petitioner represented himself at trial without any legal assistance.

At trial, evidence was presented showing that in April 2012, the Tennessee Department of Revenue (the "Department") began investigating the Petitioner after the Department's audit uncovered a discrepancy between the amount of tobacco products purchased by the Petitioner, as reported by those tobacco wholesalers who sold inventory to the Petitioner, and the amount of sales tax the Petitioner remitted to the Department in his monthly sales tax returns for 2011. Id. at *1. Agent Brian McGhee, who investigated this discrepancy, testified that he calculated the total inventory the Petitioner purchased from the wholesalers each month, and based on the theory that the Petitioner sold as much inventory as he bought, he calculated the amount of the Petitioner's gross sales. Id. He then subtracted from this gross sales amount the amount of any manufacturer's "buydown" credits before calculating the amount of sales tax that should have been collected by the Petitioner's business for each month of 2011. Id. Agent McGhee explained that a "buydown" was a manufacturer's promotion offered to a retailer in the form of a per-carton or per-item discount and that buydowns, as opposed to manufacturer's coupons, were deducted from the sales price of an item before any sales tax was calculated. Id. n.2. Agent McGhee stated that the Petitioner had failed to remit a total of $132,766.46 in sales tax to the Department for 2011. Id. at *2. Although the Petitioner terminated counsel and elbow counsel prior to trial, the trial court adjourned court the first day of trial to give the Petitioner the opportunity to subpoena records in an attempt to prove that the State's calculations regarding his unremitted taxes were incorrect. The Petitioner did not testify

- 2 -

on his own behalf at trial. Id. at *3. A more detailed summary of the proof presented at the Petitioner's trial is provided in this court's opinion on direct appeal. Id. at *1-3.

At the conclusion of the trial, the jury convicted the Petitioner as charged of one count of money laundering, one count of theft of property valued at $60,000 or more, and twelve counts of tax evasion. Id. at *3. Prior to the sentencing hearing, the Petitioner requested counsel, which the trial court appointed. At the conclusion of the sentencing hearing, the trial court sentenced the Petitioner as a Range II, multiple offender and imposed a sentence of eighteen years for both the money laundering conviction and the theft conviction and imposed sentences of four years for each of the sales tax evasion convictions. Id. The court ordered all of these sentences served concurrently for an effective sentence of eighteen years, with the Petitioner to serve five years in confinement before serving the remainder of his sentence on community corrections. Id. The trial court also imposed $80,000 in fines recommended by the jury and ordered the Petitioner to pay restitution to the State in the amount of $132,766.46, payable in installments of $500 per month following the Petitioner's release on community corrections. Id.

On direct appeal, the Petitioner argued that (1) the trial court erred by permitting the State to introduce certain evidence in violation of Tennessee Rule of Evidence 404(b); (2) the trial court erred by concluding that some of the defendant's convictions would be admissible for purposes of Tennessee Rule of Evidence 609; (3) the trial court violated his constitutional privilege against self-incrimination; (4) the State failed to discover and disclose exculpatory evidence in violation of Brady v. Maryland; (5) the evidence was insufficient to sustain his conviction for money laundering; (6) the trial court erred by imposing a Range II sentence; and (7) the sentence imposed by the trial court was illegal. Id. at *1. This court vacated the trial court's sentencing, remanding the case for resentencing because the five-year term of confinement was not authorized, and vacated the restitution order, remanding the case for the trial court to impose restitution in a manner that complied with Tennessee Code Annotated section 40-35-304, but affirmed the judgments of the trial court in all other respects. Id. at *17.

Following the remand, the trial court conducted a resentencing hearing before denying the Petitioner's request to serve his sentence on community corrections and ordering the Petitioner to serve his eighteen-year sentence in incarceration. State v. Jerry Reginald Burkes, No. E2018-01713-CCA-R3-CD, 2019 WL 3061557, at *1, *3 (Tenn. Crim. App. July 12, 2019). On appeal, the Petitioner argued that the trial court erred in not allowing him to introduce proof at the resentencing hearing concerning the Connecticut convictions used by the trial court at the initial sentencing hearing to establish that the Petitioner was a Range II offender. Id. at *3. The Tennessee Court of Criminal Appeals affirmed the trial court's judgment, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. Id. at *8.

Thereafter, the Petitioner timely filed a pro se petition for post-conviction relief. The Petitioner later filed several pro se amended post-conviction petitions. At the Petitioner's request, the court appointed post-conviction counsel. However, after the Petitioner filed several motions asserting his right to self-representation, the post-conviction court granted the Petitioner's request to proceed pro se and appointed his previous attorney as elbow counsel. Evidence was presented at two post-conviction hearings, and we have summarized the proof from these hearings that is relevant to the Petitioner's issues on appeal.

At the April 16, 2021 post-conviction hearing, the Petitioner proceeded pro se with the assistance of elbow counsel, and the hearing was conducted via "Zoom," a video conferencing platform. The Petitioner first called Sherry Tidwell, a civil tax auditor with the Tennessee Department of Revenue (the "Department"). Tidwell testified that in the original audit, the Department had a buydown credit of $65,272 for the Petitioner, which was obtained from the Petitioner's direct deposit information from his bank statements. However, she said that when the special investigation unit conducted its criminal investigation, the unit found that the Petitioner had $172,705.80 in buydown credits, so the audit was adjusted to include this $172,705.80 figure. Tidwell said that the civil division later "added [$]6,946 that [the Petitioner] provided from Liggett Vector and . . . added [$]36,655 from JT International, which brought the total buydown credit to $216,306.80."

When the post-conviction court asked whether the total buydown credit of $216,306.80 was communicated to Agent Brian McGhee, who led the criminal investigation, Tidwell replied, "I do not—I know that they had $172,705.80." She added, "[The Petitioner] provided the [buydown credits for] Liggett Vector and JT International[,] and I don't know if that was ever provided to special investigations." She clarified that the Petitioner provided the Liggett Vector and JT International buydown credits to the Department after the Petitioner was prosecuted in this case.

The State then called Agent Brian McGhee. Agent McGhee testified that when the special investigations unit calculates an individual's criminal liability, it comes up with its "own calculations" that are "different" from the calculations done by the civil division because the special investigations unit goes "out to the vendors and to the different buydown companies to get information" that the civil auditors do not collect. Agent McGhee confirmed that after the Petitioner was indicted, Sherry Tidwell learned of some additional buydown credits that should have been considered in determining the Petitioner's liability. Taking into account that information, Agent McGhee recalculated the amount of sales tax that the Petitioner owed for 2011 by giving the Petitioner buydown credits of $36,655 from JT International and $6,946 for Liggett Vector, which "reduced [the Petitioner's] corrected taxable sales amount by $43,601 and his corrected sale tax due

- 4 -

by $4,251 dollars." Consequently, Agent McGhee explained that "instead of [the Petitioner's] unreported sales tax amount for 2011 being $132,766.46[,] it would be $128,515.36." Agent McGhee agreed that although the Petitioner's tax liability was reduced by $4,251, the amount the Petitioner owed in taxes for 2011, namely $128,515.36, was well over the $60,000 threshold for the Petitioner's theft conviction.

On cross-examination, Agent McGhee acknowledged that the Petitioner, during his first interview on August 7, 2012, claimed he had received buydowns from JT International. Agent McGhee said that while the Department requested this information, JT International never provided buydown records prior to the Petitioner's trial, so this information was not included in his calculation of the Petitioner's tax liability at the trial. He agreed that although he had the Petitioner's bank statements, the special investigation unit's procedure was to request information from the specific companies regarding buydown credits. Agent McGhee acknowledged that at the Petitioner's trial, he had buydowns from Philip Morris, RJ Reynolds, and Lorillard and that the total buydown credits was $172,706.40. He explained that his total buydown credit was less than the total buydown credit arrived at by Sherry Tidwell because Tidwell included $36,655 for JT International and $6946 for Liggett Vector after "she was given documentation" regarding these additional buydown credits. The post-conviction hearing was continued to July 13, 2021.

At the July 13, 2021 post-conviction hearing, the post-conviction court considered elbow counsel's motion to withdraw and the Petitioner's request to represent himself during the post-conviction proceeding. After questioning the Petitioner, the post-conviction court ultimately entered an order granting the elbow counsel's motion to withdraw. As a result, the Petitioner proceeded pro se, without the assistance of elbow counsel, at the post-conviction hearing on July 13, 2021.

At that hearing, the Petitioner called Hope Dirksen, the Department's hearing officer who reviews taxpayer's objections to the underlying civil audit. Dirksen testified that she reviewed the Petitioner's objections to his audit and then directed audit staff to either make adjustments or to uphold the assessment. She explained that she was not responsible for any calculations regarding the Petitioner's tax liability. Dirksen noted that in the Petitioner's case, a civil audit occurred, and then the Petitioner's case was referred to the special investigations unit for a criminal prosecution because there were indicators of fraud. She stated that in order for the civil investigation not to taint the criminal investigation, the civil case was put on hold until the criminal case had been concluded.

Dirksen said she reviewed the information the Petitioner submitted regarding buydown credits and then considered whether or not these buydown credits were included in the civil tax liability assessment. She asserted that "the only document that was still in

dispute at the time the conferences ended was the S[&]M buydown [credit]." Dirksen asserted that she "probably received upwards of 20 emails from [the Petitioner's] wife with . . . attachments totaling . . . hundreds of pages[.]" Dirksen said she "would send the documents first to the audit division [to] see if they would accept them" and then Ms. Tidwell would respond as to whether the civil audit division would accept them." Dirksen acknowledged that although the civil division typically requires documentation directly from the tobacco manufacturers about buydown credits, she said that if that information was not available, the Department would sometimes accept additional documents, including bank statements.

The Petitioner also called Agent McGhee to testify at this hearing. Agent McGhee acknowledged that the Petitioner asserted during his first interview that he was entitled to buydown credits from JT International and other companies. Agent McGhee also acknowledged that the $36,655 buydown credit from JT International that was referenced in a July 2, 2020 email from the civil division of the Department was not included in his calculation of the Petitioner's criminal tax liability at the Petitioner's 2016 trial. When asked why he withheld the buydown credit for JT International, Agent McGhee replied,

> It was not withheld. I testified during the trial that our process . . . is that once I find out the buydown information, I submit that to a tech in our office[,] and he sends off for that information, and the buydown information that I got back to put in my calculations is what is in Appendix A [that was admitted at trial].

When he was asked why the Department was able to discover information about this buydown credit from JT International in 2020 but was unable to discover this information prior to the Petitioner's trial, Agent McGhee stated, "From my understanding, I don't know that [the buydown credits from] JT International w[ere] discovered by the Department of Revenue in 2020. I think [the Petitioner's wife] provided the information to the Department of Revenue."

During Agent McGhee's testimony, the post-conviction court asked if the Petitioner had a document that calculated his tax obligation to be less than $60,000, and the Petitioner admitted that he did not have such a document. The court noted that the State, in its motion to dismiss, asserted that even if the Petitioner had received the buydown credits he alleges, the Petitioner still owed taxes in an amount "nowhere near below sixty thousand dollars" required for the theft conviction.

When questioning resumed, Agent McGhee stated that the 1099 miscellaneous form from R.J. Reynolds concerned contract payments of $36,000 and $2700 that were related to display, not buydown credits, and therefore were not included in his calculation of the

Petitioner's tax liability. After reviewing the July 2, 2020 email from Sherry Tidwell to Hope Dirksen, which detailed the buydown credits to which the Petitioner was entitled on the civil case, the Petitioner asked Agent McGhee why these buydown credits were not utilized during the investigation of the Petitioner's criminal case, and Agent McGhee replied that he was "not aware" of the additional buydown credits at the time of his investigation and noted that the referenced email between Tidwell and Dirksen was dated July 2, 2020."

When the post-conviction court asked the Petitioner if he was conceding that the Department's civil division calculation of the pertinent figures was correct, the Petitioner asserted that no one had correctly calculated his tax liability. The Petitioner acknowledged that "the earliest possible date the state agents knew [of] additional buydown [credits] was in the spring of 2020" but asserted that Agent McGhee "had [his] bank records" and had "additional information" that proved the validity of these buydown credits. The Petitioner asserted that the new buydown credit information from JT International and Liggett Vector that was recognized in the July 2, 2020 email between Tidwell and Dirksen came "from the state, not from me," that he did not have this new buydown information at trial, and that he did not receive the information about the new buydown credits until sometime in 2020.

When questioning once again resumed, the Petitioner asked Agent McGhee if the new buydown information from JT International and Liggett Vector was included in his calculations of the Petitioner's tax liability at trial, and Agent McGhee responded, "As I've said numerous times, I did not have this information during the trial, so it was not utilized." He confirmed that he did not withhold any information during the Petitioner's trial. He also asserted that the Petitioner "at trial . . . never brought up S[&]M Brands as a buydown." Agent McGhee said that the $216,306.80 in total buydown credits did not include an undisclosed amount of buydown credit from S&M Brands that he included in his calculations for the post-conviction proceedings in order to give the Petitioner "as much credit as feasibly possible[.]" Agent McGhee stated that he did not have buydown information from JT International, Liggett Vector, or S&M Brands at the time of the Petitioner's trial, so he "didn't have anything to withhold from the jury." When Agent McGhee was asked if the civil division had access to buydown information that the criminal division did not, he explained that the civil division "didn't have it until after the [Petitioner's] criminal trial" and the civil division "didn't have it during [the Petitioner's] audit before it was referred to s[pecial] i[nvestigations]."

As to the Petitioner's claim that the State violated <u>Brady</u> by failing disclose the additional buydown credits, the post-conviction court commented,

JT [International] is not an agency of the [S]tate[,] and these other companies are not agencies of the [S]tate, so—just because there's information out there that the [S]tate did not have custody or control over, it's not suddenly charged to [it]. And so [the Department has] acknowledged that S[&]M Brands and Liggett Vector and JT International, that those [buydown credit] numbers were not included in the trial calculation and that they didn't have those numbers at that time. And so no matter how many times you ask that question, the simple answer and what is relevant for me to consider as far as a Brady violation is did the [S]tate have that information, were they aware of it[,] and when they became aware of it.

The Petitioner then claimed that Agent McGhee committed perjury during the post-conviction hearing when he testified that he did not have the additional buydown information at the time of the Petitioner's trial. The post-conviction court responded that there had been no proof that Agent McGhee had not testified truthfully.

After the conclusion of Agent McGhee's testimony, the Petitioner admitted into evidence the referenced July 2, 2020 email from Sherry Tidwell to Hope Dirksen regarding the buydown credits that the civil division had provided to the Petitioner for the year 2011. This email referenced the following buydown credits for 2011:

| Phillip Morris | $134,269.00 |
| RJ Reynolds | $ 36,326.30 |
| Lorrilard | $ 2,110.50 |
| Liggett Vector | $ 6,946.00 |
| JT International | $ 36,655.00 |
| **TOTAL BUYDOWN CREDITS FOR 2011:** | **$216,306.80** |

This June 2, 2020 email also stated the following: "We cannot accept the S&M buydowns because there are no dates on the spreadsheets showing when buydowns were for or when they were paid. The spreadsheets are also not on company letterhead . . . ."

The Petitioner additionally called Sherry Tidwell to testify at this hearing. Tidwell stated that she sent an email to Hope Dirksen, the administrative hearing officer, on July 2, 2020. Tidwell confirmed that she used the Petitioner's bank statements to get deposit information about buydown credits from the tobacco manufacturers. When she was asked whether the criminal investigation used the Petitioner's bank statements that the civil side utilized, Tidwell said, "I think that the criminal—the special investigations [unit] contacts the manufacturers directly. I don't know that they used the bank [statements]—I don't know that they had the bank statements."

- 8 -

Tidwell said that the civil division calculated the Petitioner's total buydown credit to be $216,306.80 after including buydown credit information from the Petitioner's bank statements, from the information the criminal special investigations unit received from the tobacco manufacturers, and from the additional information provided by the Petitioner that was verified by the manufacturers. She said she believed that the only two tobacco manufacturers that made deposits evidenced in the Petitioner's bank statements were Philip Morris and R.J. Reynolds.

Tidwell stated that the civil division did not get involved with the criminal investigation. She noted that if the civil division, after looking at an individual's books and records, determined that there could be fraudulent activity, then it passed that information on to the criminal investigators. She said that the civil audit division does not make an assessment at the time a case is given to criminal investigators.

In response to questioning from the post-conviction court, Tidwell said that the additional information she received about buydown credits from JT International, Liggett Vector Brands, and S&M Brands came from the Petitioner's wife in 2020 after an informal conference. She acknowledged that she did not tell Agent McGhee about these additional buydown credits, but she did use at least some of these buydown credits to reduce the Petitioner's tax assessment from the civil division. Tidwell affirmed that the buydown credits from JT International, Liggett Vector Brands, and S&M Brands were not derived from the Petitioner's bank records; instead, the buydown credits from these three manufacturers were derived from information the Petitioner's wife provided, which the civil division then attempted to verify through the tobacco manufacturers.

Finally, the Petitioner called appellate counsel, a Greene County Public Defender, to testify at this hearing. Appellate counsel stated that he represented the Petitioner on direct appeal and handled the sentencing issues regarding that appeal while another attorney, Counsel B, handled the trial issues for the direct appeal. Although the Petitioner suggested during his questioning that Counsel B had sustained a back injury and did not continue representing him on direct appeal, appellate counsel said that Counsel B signed and filed the appellate brief in the Petitioner's case and handled all the trial issues. When the Petitioner asked appellate counsel about whether the defective presentment and the State's decision to pursue a supersedeas presentment would have been grounds for constitutional error that needed to be raised on direct appeal, appellate counsel replied, "I'm unaware of any defects in your presentments. I never—that was not part of my representation of you, so I can't answer whether or not presentments in your case did in fact have any level of defect to them[.] Appellate counsel then explained, "[T]he Rules of Criminal Procedure state that if you're going to move to dismiss for a fatal flaw in the indictment or something along those lines, that it has to be a pretrial motion."

When the Petitioner asked if appellate counsel had attempted to raise the issue of an invalid charging instrument on appeal, appellate counsel replied that he did not recall whether a motion to dismiss was ever filed in the Petitioner's case. At that point, the trial court interjected:

> I can't find ineffective assistance of counsel regardless of whether [appellate counsel] was instructed to file that appeal or not instructed to file that appeal based on the presentment because it's obvious that there's no defect in the presentment. There was a presentment. There was a supersedeas presentment that replaced the presentment[,] and we went to trial. It's just that simple.

When questioned about whether he investigated the buydown credits, appellate counsel stated that to his knowledge, Counsel B investigated that issue. Appellate counsel asserted that he did not follow-up on that issue in the Petitioner's appeal because it was "outside the scope of [his] representation" because he just handled the sentencing issues on direct appeal.

When the Petitioner asked whether appellate counsel had challenged the State's erroneous introduction of evidence from 2009 to 2013, appellate counsel stated that "[t]he record had to be preserved by trial counsel [, namely the Petitioner who represented himself at trial,]" and that if Counsel B did not raise that issue on appeal, then "it was probably a failure of trial counsel" to preserve the record.

When the Petitioner asked appellate counsel about whether he included the audio recording on appeal that was excluded at trial, appellate counsel replied, "If the audio [recording] that you're talking about is not in this designation of record, it would be because trial counsel failed to either proffer it into evidence or get it into evidence during the course of the trial." The post-conviction court then added, "I remember the audio in which you lied to the investigators and told them you weren't recording them" when they asked you questions about an unrelated tax case involving a different individual. The court asserted that this audio recording was played during a "jury out" hearing at trial and that the court ultimately excluded this recording because the "only questions that the investigators asked in that secret recording w[ere] about another tax individual and you were claiming that was a smoking gun." The Petitioner said he did not recall telling the investigators that he was not recording them. The trial court then asserted,

> [The audio recording in question] established absolutely nothing favorable to you and would have established that you were misrepresenting to the investigating officers whether they're being recorded or not. . . . [T]he court properly excluded that [audio recording]. It was of no evidentiary value and

- 10 -

could only possibly serve to have undermined, to put it nicely, your credibility to the jury.

When the Petitioner asked appellate counsel whether he was responsible for the record on appeal, appellate counsel replied, "Well, again, that would be trial counsel's responsibility to preserve the record during trial." He added, "[Counsel B] handled [the] trial aspect of your appeal, so whatever conversations you had with him and, you know, I would assume that you approved the brief before it was sent before the criminal appeals as far as the trial aspect is concerned."

At the conclusion of appellate counsel's testimony, the Petitioner announced that he had subpoenaed the Assistant District Attorney General, who prosecuted him at trial and was representing the State in his post-conviction case, to testify at the post-conviction hearing. When the post-conviction court asked what the purpose was in subpoenaing this prosecutor, the Petitioner acknowledged that the court had already determined that the prosecutor had the right to seek a superseding presentment but he wanted to question the prosecutor about why Ronnie Metcalfe had been the grand jury foreman for the last thirty years without any "African Americans or any other nationality even" given the opportunity to serve as a grand juror. The Petitioner also questioned whether he could have a fair trial if African Americans were excluded from the grand jury in Greene County because they did not have a driver's license. When the post-conviction court asked if the Petitioner was talking about the grand jury foreman or the grand jury, the Petitioner said his concern was about the grand jury foreman. In response to questioning from the court, the prosecutor acknowledged that Ronnie Metcalfe had served as the grand jury foreman in Greene County for "a very long time" but that "nothing under the law . . . precludes that." The prosecutor added that the "grand jury foreman carries no more weight in the grand jury proceeding than any other grand juror" because "[h]e is simply one vote." He admitted that Metcalfe probably served as grand jury foreman for "probably decades." The post-conviction court then stated, "We'll just take as a stipulation that for over a decade, possibly more than a decade . . . the grand jury foreman was the same individual. Okay. So we don't need proof of that. There's a stipulation."

The Petitioner then argued that pursuant to Rule 6(g) of the Tennessee Rules of Criminal Procedure the grand jury foreman "shall hold office and powers for a term of two years from appointment," and the post-conviction court explained that a grand jury foreperson can be reappointed. The Petitioner claimed that this procedure of reappointment was "unconstitutional" because "it did not include any other racial groups or ethnic backgrounds[.]" The Petitioner also referenced Rose v. Mitchell, 443 U.S. 545, 556 (1979), arguing that "[a] criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from [which] members of a racial group purposefully have been excluded." The Petitioner also asserted, "For decades [there was]

- 11 -

no other grand jury [foreman] other than Ronnie Metcalfe[,]" and "[h]is son . . . bec[a]me his [suc]cessor." The post-conviction court explained that the grand jury foreperson is appointed by the judge, which for the last sixteen years had been Judge John Duggar, and that when the foreperson's "term expires, if the judge is satisfied with [the foreperson's] presentation, then they reappoint them[sic][.]" The court asked if the Petitioner's position was that Judge Duggar had excluded other people based on race by reappointing Ronnie Metcalfe, and the Petitioner responded affirmatively. The post-conviction court then stated:

> Well, the court doesn't accept that and, quite frankly, finds it highly offensive because the duty of the grand jury foreman is such that you want somebody that's experienced in that position and as [Tennessee Rule of Criminal Procedure 6(g)(3)] clearly says, "[T]he foreperson shall hold office and exercise powers for a term of two years from appointment. In the discretion of the presiding judge, the foreperson may be removed, relieved, or excused from office for good cause at any time." And so it's just simply that Judge Duggar has been satisfied, of course, unfortunately, he's deceased at this point in time, that Mr. Metcalfe was doing a good job, and he kept reappointing him.

> You may disagree with that, but that doesn't make it racist or biased or anything else.

The court told the Petitioner, "You haven't established anything here other than a baseless allegation." The Petitioner acknowledged, "I'm not here to discuss race as the premise. For me the premise is just more of a risk of taint in the grand jury process."

On August 6, 2021, the post-conviction court entered an order denying post-conviction relief. The Petitioner timely, though prematurely, filed a notice of appeal in this case.

## ARGUMENT

The Petitioner argues on appeal that he received ineffective assistance of appellate counsel, that the State violated Brady by withholding information relevant to the Petitioner's tax liability, that he was convicted upon an invalid presentment, that he was deprived of a fair and impartial grand jury in violation of the Fourteenth Amendment, that the trial court erroneously admitted evidence in violation of Tennessee Rule of Evidence 404(b), and that the evidence is insufficient to sustain his conviction for money laundering. In response, the State contends that the Petitioner is not entitled to relief for a variety of reasons. We conclude that the Petitioner failed to establish that he received ineffective

- 12 -

assistance of appellate counsel and that the remainder of the Petitioner's claims have been previously determined, waived, or do not entitle him to relief.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving his or her factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). As a result, "appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

**I.** **Ineffective Assistance of Counsel Claims.** The Petitioner argues that appellate counsel provided ineffective assistance in failing to include in the appellate record certified copies of the judgments for his prior Connecticut convictions upon which the trial court relied at the first sentencing hearing in order to sentence him as a Range II offender. The Petitioner also contends that appellate counsel provided ineffective assistance in failing to include an allegedly exculpatory audio recording between Agent McGhee and the Petitioner that was excluded at trial.

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. A claim for post-conviction relief based on alleged ineffective assistance of counsel is a mixed question of law and fact. Moore v. State, 485 S.W.3d 411, 419 (Tenn. 2016); Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert, 342 S.W.3d at 485).

- 13 -

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) this deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369). Nevertheless, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" Id. (quoting Goad, 938 S.W.2d at 369).

**A. Judgments.** As best we can determine, the Petitioner argues that appellate counsel provided ineffective assistance in failing to include in the appellate record certified copies of the judgments for his prior Connecticut convictions upon which the trial court relied at the first sentencing hearing in order to sentence him as a Range II offender. He claims these judgments were not properly admitted into evidence and did not satisfy the requirements of Tennessee Rule of Evidence 902.

At the Petitioner's initial sentencing hearing, the State informed the trial court that it had filed a notice to have the Petitioner sentenced as a Range II, multiple offender and that it had certified copies of the Petitioner's prior convictions to support this range. The

State provided the trial court with certified copies of the Petitioner's Connecticut judgments as well at the applicable Connecticut Code sections for these convictions and the equivalent Tennessee Code sections. The State conceded that, after evaluating the elements of the Petitioner's Connecticut conviction for possession of any narcotic substance, this conviction would not have been a felony in Tennessee, and, therefore, could not be used to calculate his sentencing range. However, the State argued that the Petitioner's second Connecticut conviction for the sale of a controlled substance or the possession with intent to sell a controlled substance would have been at least a Class C felony under the Tennessee law in effect at that time. The State also argued that the Petitioner's two federal cocaine convictions would have been Class B felonies under the equivalent statute in Tennessee but acknowledged that the two federal convictions should be counted as one offense because they occurred on the same date.

The Petitioner's attorney objected to the use of all out-of-state convictions. He argued, in part, that the trial court should disregard the certified copies of the Connecticut judgments because there was a possibility that these judgments did not accurately reflect what occurred in those cases, given that the Petitioner's attorney went to Connecticut to help the Petitioner modify these cases in 2006. He then submitted uncertified documentation from this attorney to the trial court. The Petitioner's attorney also argued that because the Connecticut judgments had not been certified by a clerk at the Superior Court of Connecticut and were instead certified mittimus judgments from the Connecticut Department of Corrections, the judgments were not self-authenticating under Tennessee Rule of Evidence 902. The trial court stated that it would consider the Connecticut judgments, and after comparing the elements of the federal offenses and Connecticut offenses to the applicable Tennessee offenses, concluded that the Petitioner had the required number of convictions to be a Range II, multiple offender.

On direct appeal, the Petitioner argued that the trial court erred in imposing a Range II sentence in this case, claiming that the trial court, when calculating his range, erroneously considered evidence that was not properly admitted during the sentencing hearing and that the trial court failed to apply the appropriate test to determine whether his out-of-state convictions qualified as felonies in Tennessee. Jerry Reginald Burkes, 2018 WL 2194013, at *10. This court noted that the State's notice seeking enhanced punishment, the certified copies of the Petitioner's prior convictions, and the Connecticut statutes under which the Petitioner had been convicted were not included in the record on appeal. Id. at *11. However, it held that because the trial court stated that it would consider the certified judgments and the Connecticut statutes and then used these documents to perform an elements analysis of the convictions, these documents had been admitted into evidence, even though they were not included in the record on appeal. Id. at *12. After noting that the defendant had the burden to prepare an adequate record on appeal and that in the absence of an adequate record, the appellate court must presume that the trial court's ruling

was correct, this court held that it could not consider the Petitioner's claim that the documents did not satisfy the requirements for admissibility under Rule 902. Id. at *13. Nevertheless, this court concluded that after utilizing the Petitioner's federal conviction for distributing cocaine, which would have been a Class C felony, and his Connecticut conviction for the sale of narcotics, which also would have been at least a Class C felony, the trial court did not err in imposing a Range II sentence. Id. at *15.

At the Petitioner's resentencing hearing following the remand, the trial court noted that it had already conducted a sentencing hearing in the Petitioner's case and that the Court of Criminal Appeals had "affirmed all the sentencing hearing components" with the exception of "split confinement [and restitution]," so the court did "not envision going back through every single thing that [it] previously ruled on[.]" Appellate counsel stated that he had filed a motion to exclude consideration of the Connecticut judgments in determining the Petitioner's range of punishment, even though the trial court had just stated that it did not intend to reopen that issue. Appellate counsel then proffered copies of the Petitioner's Connecticut judgments, explaining that although the Connecticut judgments and statutes were "made exhibits" in the first sentencing hearing, "for whatever reason they didn't get sent [as a part of the appellate record]." Appellate counsel also proffered a letter from the Petitioner's Connecticut attorney and two motions for modification of sentences the Petitioner received from the Connecticut Superior Court for his convictions for sale of narcotics and possession of narcotics with intent to sell. These two motions requested that the Connecticut court modify the Petitioner's sentence by "suspending execution of the unexecuted portion of the jail sentence." The State objected to the admission of the attorney letter and motion on the basis that the documents were not certified, and the trial court questioned the relevancy of these documents, stating, "I'm not getting what a motion to modify the sentence has to do with anything because this is not an order saying that it was modified." Ultimately, the court sustained the State's objection and refused to consider the letter from the Petitioner's Connecticut attorney or the accompanying motions but allowed these documents to be made an exhibit to the hearing. When appellate counsel asked the trial court to rule on his current motion to exclude the Connecticut judgments from consideration, the trial court stated, "[T]he ruling is the same as it was in the last hearing. I'm admitting the Connecticut documents." The court noted that the Tennessee Court of Criminal Appeals had affirmed its finding from the first sentencing hearing that the Petitioner was a Range II offender. It recognized that the "original Connecticut judgments" were in the file from the first sentencing hearing and were "considered by the Court previously" and then made these original Connecticut judgments and the corresponding Connecticut statutes an exhibit to the resentencing hearing. Thereafter, the trial court sentenced the Petitioner to eighteen years' incarceration, imposed the same fine that it had previously imposed, and ordered that the Petitioner would not be required to pay restitution in light of his sentence of confinement.

Following resentencing, the Petitioner appealed, arguing in part that the trial court abused its discretion in not allowing him to introduce evidence concerning the Connecticut convictions used by the trial court to sentence him as a Range II offender at the initial sentencing hearing. Jerry Reginald Burkes, 2019 WL 3061557, at *3. In considering this issue, this court recognized that in its opinion on direct appeal, it affirmed the Petitioner's convictions, the trial court's finding that the Petitioner was a Range II offender, and the length of the sentence imposed by the trial court. Id. at *4. Consequently, it concluded that the law of the case doctrine precluded the Petitioner from relitigating his offender classification. Id. The court held that none of the three exceptions to the "law of the case" doctrine applied because "[t]he evidence offered at the sentencing hearing after remand was not substantially different from the evidence in the initial proceeding, the prior ruling finding the Defendant a Range II offender was not clearly erroneous and does not lead to manifest injustice, and there ha[d] been no change in the sentencing law governing sentence range during the pendency of this case." Id.; see Memphis Pub. Co. v. Tennessee Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998) (stating that the law of the case doctrine "generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case" unless "(1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal"). Accordingly, this court held that the Petitioner was not entitled to relief because the trial court properly limited resentencing to the manner of service of the sentence and restitution. Id.

At the post-conviction hearing, the Petitioner asked whether appellate counsel was responsible for the record on appeal, and appellate counsel replied, "Well, again, that would be trial counsel's responsibility to preserve the record during trial." At the conclusion of this hearing, the post-conviction court held, "There's been nothing established that there was ineffective assistance of counsel."

While the Petitioner is clearly attempting relitigate this issue of his sentencing range through an ineffective assistance of counsel claim, he is not entitled to relief because he cannot show prejudice. In the direct appeal, this court held that the trial court did not err in imposing a Range II sentence. Although the Connecticut certified judgments were not included in the appellate record for the Petitioner's direct appeal, this court nevertheless reviewed the issue of the Petitioner's range on the merits and concluded that the Petitioner was properly sentenced as a Range II offender. In the Petitioner's appeal following resentencing, this court held that the trial court had properly limited resentencing to the manner of service of the sentence and restitution after concluding that the law of the case doctrine precluded the Petitioner from relitigating his offender classification. Accordingly, because the Petitioner has failed to establish a reasonable probability that, but for counsel's

allegedly unprofessional errors, the result of the proceeding would have been different, he is not entitled to relief on this issue.

B. **Audio Recording.** The Petitioner also contends that appellate counsel was ineffective in failing to include in the appellate record an alleged exculpatory audio recording between Agent McGhee and the Petitioner that was excluded by the trial court at trial. Although not clear from the Petitioner's brief, it appears that the Petitioner is also claiming that appellate counsel should have challenged the trial court's exclusion of this audio recording on appeal. The Petitioner claims that this recording "included Justin W[hite][2] . . . and how his sales and use tax calculations [we]re identical to [the Petitioner's] sales and use tax calculations." He asserts that this audio recording was admissible under the business records exception to the hearsay rule in Tennessee Rule of Evidence 803(6), and he insists that this recording would have "enabled appellate counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than [the Petitioner] committed the alleged sales and use tax violations."

The record shows that during a jury-out hearing at trial the Petitioner attempted to introduce an audio recording that the Petitioner made during an interview with Agent McGhee regarding the Justin White investigation, an investigation totally unrelated to the Petitioner's investigation by the Department of Revenue. This audio recording was played during the jury-out hearing and was later admitted into evidence for identification only at trial.

In this audio recording, Agent McGhee and Agent Sherry Garrett approached the Petitioner at his store and begin asking the Petitioner questions about whether he had bought cigarettes from Justin White. The Petitioner stated that he opened his store on April 1, 2009, when he obtained his business license. He told both agents that he was not actually recording their conversation because he was "trustworthy" and then reassured them that "nothing is on." The Petitioner claimed he had "receipts" or "invoices" for the purchases he made from Justin White, and explained that during 2009 he was purchasing only "miniscule" amounts of cigarettes from White in the "evenings" after the White's store was closed. Agent McGhee said that "from the DA's standpoint," the agents needed something from the Petitioner acknowledging that he purchased cigarettes from Justin White but that the amount of the Petitioner's purchases was not "1.5 million." The Petitioner stated that during a two-month period in 2009, he purchased "$2400 at best" in "tax exempt" cigarettes from White. The Petitioner also claimed he paid taxes on that $2400 worth of cigarettes. At the close of this conversation, the recording indicates that Agent McGee had the Petitioner sign a statement, wherein the Petitioner acknowledged that he opened his

---

[2] Although the Petitioner referred to this individual as Justin Wyatt, the State and the State's witnesses identified this individual as Justin White.

business in "April 2009" and that during the period from "April 2009 to July 2009," the Petitioner purchased "approximately $2400" in "tax exempt" cigarettes from "Justin White" at "Kiker's Tobacco Outlet."

After this audio recording was played during the jury-out hearing, the State objected to it on the ground of relevance because the recording concerned Agent McGhee's investigation of Justin White, not the Petitioner. The State also asserted that if the Petitioner was seeking to admit any of his own statements on this recording, the Petitioner's statements would be self-serving and inadmissible because the State could not cross-examine them. Ultimately, the trial sustained the State's objection to the audio recording, concluding that the recording was "irrelevant" and "hearsay." The court opined that the only reason the Petitioner was trying to introduce the audio recording was to present evidence that the Petitioner did not want to introduce through his own testimony at trial.[3] The court asserted that this audio recording could not possibly be favorable to the Petitioner because during the recording, he tells Agent McGhee that he was not recording the interview, even though he was recording it.

At the post-conviction hearing, the Petitioner asked appellate counsel about whether he included the audio recording that was excluded at trial on appeal, and appellate counsel replied, "If the audio [recording] that you're talking about is not in this designation of record, it would be because trial counsel[, namely the Petitioner who represented himself at trial,] failed to either proffer it into evidence or get it into evidence during the course of the trial." At this hearing, the trial court told the Petitioner the audio in question "established absolutely nothing favorable to you" and "would have established that you were misrepresenting to the investigating officers whether they're being recorded or not . . . ." The court then stated that it "properly excluded that [audio recording]" because "[i]t was of no evidentiary value and could only possibly serve to have undermined, to put it nicely, [the Petitioner's] credibility to the jury." At the conclusion of this hearing, the post-conviction court held:

> There's been nothing established that there was ineffective assistance of counsel. And importantly, throughout the entire trial you were trial counsel. I mean, you were representing yourself. And so the court refuses to accept the position that a person can represent themselves, muck the case up and then claim [appellate counsel] were ineffective.

The transcript from the post-conviction hearing shows that the Petitioner failed to present any testimony from the appellate counsel who was responsible for appealing the Petitioner's trial errors. Moreover, despite the Petitioner's claims to the contrary, the

---

[3] The Petitioner, who represented himself at trial, chose not to testify on his own behalf.

appellate record from the Petitioner's direct appeal did include this audio recording, which was made an exhibit for identification only. For these reasons, the Petitioner cannot establish that appellate counsel was deficient in failing to include the audio recording in the appellate record. See Tenn. Code Ann. § 40-30-110(f).

In addition, the Petitioner has failed to establish that appellate counsel was deficient in failing to challenge the trial court's exclusion of this audio recording at trial or that this alleged deficiency prejudiced his case. We conclude that the trial court properly excluded the recording. The audio recording was irrelevant because it concerned the Department's unrelated tax investigation of Justin White and the related purchases the Petitioner made from White in 2009. In addition, this recording was inadmissible hearsay because the Petitioner was offering the Petitioner's and Agent McGhee's statements to prove the truth of the matter asserted and no hearsay exception applied. Although the Petitioner claims that this audio recording was admissible under the business records hearsay exception, the recording was not made by a person "with a business duty to record or transmit" this information and was not made "in the course of a regularly conducted business activity." Tenn. R. Evid. 803(6). In addition, this recording was not properly authenticated under Rule 901 or 902 of the Tennessee Rules of Evidence. Because the Petitioner has failed to show that appellate counsel's performance was deficient with regard this audio recording, the Petitioner is not entitled to relief.

**II. Remaining Claims.** The Petitioner also argues that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by withholding information relevant to the Petitioner's tax liability, that he was convicted upon an invalid presentment, that he was deprived of a fair and impartial grand jury in violation of the Fourteenth Amendment, that the trial court erroneously admitted evidence in violation of Tennessee Rule of Evidence 404(b), and that the evidence is insufficient to sustain his conviction for money laundering. All of these claims are either previously determined, waived, or do not entitle the Petitioner to post-conviction relief.

"A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-106(h); Tenn. Sup. Ct. R. 28, § 2(E). "A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." Tenn. Code Ann. § 40-30-106(h); see Berry v. State, 366 S.W.3d 160, 170 (Tenn. Crim. App. 2011) (concluding that the petitioner's claim of a speedy trial violation was previously determined on direct appeal because the supreme court and the court of criminal appeals considered the petitioner's claim under the relevant authorities and in light of the evidence available to it at the time). On the other hand, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of

competent jurisdiction in which the ground could have been presented" unless the ground is based on a constitutional right not recognized as existing at the time of trial, if either the federal or state constitution requires retroactive application of that right, or the failure to present the ground was the result of unconstitutional state action. Tenn. Code Ann. § 40-30-106(g). "There is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived." Id. § 40-30-110(f). The statutorily-created doctrines of "previously determined and "waived" help avoid "an open- and possibly never-ending approach to post-conviction review." State v. West, 19 S.W.3d 753, 756 (Tenn. 2000).

**A. Brady.** The Petitioner raises a freestanding claim that the State committed a Brady violation by failing to disclose a total of $749,000 of Promotional Tobacco Buydown Credit Payments, which he claims would have lowered his tax liability below the $60,000 threshold required for his theft conviction. Specifically, the Petitioner claims the State "maliciously withheld favorable . . . exculpatory evidence" consisting of buydown credits from JT International Brands in the amount of $36,655, S&M Brands in the amount of $26,000, Liggett Vector Brands in the amount of $8,000, and Inmar Coupon Redemption Processing Center and CPC Inc. 1099 in the amount of $147,000. He claims this suppressed information was "material to the issue of guilt or innocence" because there is "reasonable likelihood" that it could have affected the jury's verdict. See Wearry v. Cain, 577 U.S. 385, 392 (2016). The Petitioner also asserts that he never "had the opportunity to possess the same information [regarding these buydown credits]" as the State of Tennessee because his business records and property were seized and never returned.

Initially, we note that this is not the first time that the Petitioner has asserted a Brady violation based on the State's alleged failure to disclose these buydown credits. On direct appeal, the Petitioner, with the assistance of appointed counsel, argued that the State violated the constitutional requirement that it disclose exculpatory evidence by failing to obtain and provide coupon information from a company identified as "Inmar Coupon Redemption" and by failing to obtain and provide buydown information from a company identified as "JT International." See Jerry Reginald Burkes, 2018 WL 2194013, at *6. This court held that the Petitioner was not entitled to relief on direct appeal because "the challenged evidence was not within the exclusive control of the prosecution and was instead equally available to both the [Petitioner] and the State through the use of compulsory process." Id. at *7. Accordingly, we conclude that to the extent that the Petitioner again challenges the State's failure to disclose buydown information from JT International as a stand-alone claim, we conclude that this claim has been previously determined, see Tenn. Code Ann. § 40-30-106(h); Tenn. Sup. Ct. R. 28, § 2(E); Berry, 366 S.W.3d at 170, and this court's opinion on direct appeal regarding the JT International buydown credit is the law of the case, see Memphis Publ'g. Co., 975 S.W.2d at 306. Although the Petitioner suggests that the exceptions to the law of the case doctrine apply,

- 21 -

"[n]o Tennessee court has yet invoked the law of the case doctrine's exceptions . . . to support reconsideration of a previously determined issue in the post-conviction context." William G. Allen v. State, No. M2009-02151-CCA-R3-PC, 2011 WL 1601587, at *8 (Tenn. Crim. App. Apr. 26, 2011), perm. app. denied (Tenn. Aug. 25, 2011).

While an argument could be made that the Petitioner waived his remaining claims regarding buydown credits from other manufacturers/companies by failing to raise these claims on direct appeal, the Petitioner asserted at the post-conviction hearing that he did not receive information about these other buydown credits until sometime in 2020. Accordingly, we will address these claims on the merits.

In Brady, 373 U.S. at 87, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to prove a Brady violation, the defendant must establish the following four elements:

1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2) that the State suppressed the information;
3) that the information was favorable to the accused; and
4) that the information was material.

Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001) (citing State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995)).

"The prosecution is not required to disclose information that the accused already possesses or is able to obtain[.]" State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (citing State v. Caldwell, 656 S.W.2d 894, 897 (Tenn. Crim. App. 1983); Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). In addition, the prosecution has no duty to "seek out exculpatory evidence not already in its possession or in the possession of a governmental agency. Id. "When exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery.'" Id. (quoting United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985)).

In its order denying relief, the post-conviction court made the following findings of fact and conclusions of law:

[T]he Court accredits the testimony of [A]gent McGhee and Sherry Tidwell, Tax Auditor, and finds that the State did not have the records [of these additional tobacco buydown credits] nor were they aware of their actual existence until 2020[,] well after the [Petitioner's] jury trial; furthermore, the proof clearly established that [the Petitioner's] wife is the one who provided the initial records to the civil tax division of the Department of Revenue. These records were not provided to the criminal division until after they were submitted to the civil division in 2020. The Court further finds [that the Petitioner's Brady] claim . . . fails because [the Petitioner] was aware of the existence of [these additional tobacco buydown credits] from the beginning of the investigation and could have obtained any necessary documents or witnesses prior to the jury trial. [The Petitioner] was completely aware of all the State's evidence against him because the District Attorney for the Third Judicial District operates with an open file policy and provided [the Petitioner] with full discovery. [The Petitioner] was a business owner with direct relationships with the cigarette manufacture[r]s and their buydown programs and was in a better position than anyone to know of and procure evidence that would be beneficial to his case.

The record fully supports the trial court's findings and conclusions. The proof presented at the post-conviction hearing shows that this buydown information was not in the possession of the State at the time of the Petitioner's trial, that the Petitioner's wife ultimately disclosed this buydown information to the State in 2020, and that the Petitioner, who was aware of the existence of these buydown credits from the beginning of the investigation, could have obtained the necessary proof or witnesses prior to his trial. The State had no duty to seek out exculpatory evidence of the buydown credits not already in its possession. Because evidence of these additional buydown credits was "equally available to the [Petitioner] and the State through the use of compulsory process," see Jerry Reginald Burkes, 2018 WL 2194013, at *7, the Petitioner bears the responsibility for his failure to discover it. Because the State committed no Brady violation regarding these buydown credits, the Petitioner is not entitled to relief.

**B. Presentments.** The Petitioner also claims as a stand-alone issue that both the original presentment and the superseding presentment in his case were defective. He claims that "the original presentment was not . . . returned in open court by any grand jury" and that the "plethora of defects" in his original presentment "forbids the filing of a superseding presentment." He additionally maintains that "the superseding presentment [wa]s fatally defective in failing to inform [him] of alleged acts of underpayment after the period covered by the defective presentments."

In addition to the previous claims, the Petitioner also asserts that because the State tried him on both the original and superseding presentments, he received multiple sentences for a single offense, which violated the protections against double jeopardy. Moreover, he asserts that because there was "a single, continuing tax evasion relative to only one complaint from the Tennessee Department of Revenue" that occurred over "twelve (12) transactions from January through December 2011, there can be only "one penalty." Finally, he claims that because the charged offenses of tax evasion, money laundering and theft all occurred "within the same time frame" they constitute "one single criminal act" and that his convictions for all of these offenses violate double jeopardy.

The Greene County Grand Jury initially issued a presentment charging the Petitioner with eleven counts of money laundering, one count of forgery, one count of theft of property valued $60,000 or more, and twelve counts of sales tax evasion. The "Yes" or "No" blank for "True Bill" was not marked for any of the counts of this presentment. In addition, while the first count charging the Petitioner with money laundering was signed by the grand jury foreperson and the entire grand jury, the rest of the counts were signed by the foreperson only.

Prior to trial, the Petitioner filed a pro se motion to dismiss the indictment, despite the fact that he was actually charged by presentment. In this motion, he alleged, in part, that the indictment might result in multiple sentences for an alleged single offense in violation of constitutional double jeopardy provisions. At the hearing on this motion, the trial court mistakenly determined that the original presentment was invalid because none of the counts had been marked as a true bill.

The State then obtained a superseding presentment charging the Petitioner with one count of money laundering, one count of forgery, one count of theft of property valued at $60,000 or more, and twelve counts of sales tax evasion. Once again, the grand jury foreperson and the entire grand jury signed the first count, but only the foreperson signed the remaining counts. On the superseding presentment, each count was marked "Yes" for "True Bill," even though this was not required. Id. at *1 n.1 (reiterating that a presentment does not have to be marked a true bill in order to be valid).

Thereafter, the Petitioner filed a motion to dismiss the superseding indictment, claiming that the trial court had dismissed the original indictment before the State obtained the superseding indictment,[4] that the superseding indictment violated the Speedy Trial Act, and that the State's failure to conduct a thorough investigation should preclude the State's ability to obtain a superseding indictment. While an order denying this motion is not

---

[4] We note while the petitioner referred to the charging instrument as an indictment, it was in fact a presentment. Moreover, the record shows that trial court did not dismiss the original presentment.

included in the appellate record, the record nevertheless indicates that this motion was, in fact, denied.

In its order denying relief, the post-conviction court held, "[The Petitioner] attempted to reraise previously determined issues concerning the validity of the presentments against him. The Court previously found and again finds no evidence to support the allegations that the presentments were defective[.]"

Initially, we note that the Petitioner's claim regarding his receipt of multiple sentences for an alleged single offense is most likely previously determined, given that the trial court denied the Petitioner's motion to dismiss that raised this same issue. See Tenn. Code Ann. § 40-30-106(h). In addition, it appears that the Petitioner waived all remaining claims by failing to raise them prior to trial, see Tenn. R. Crim. P. 12(b)(2), (f), and waived all claims related his presentment and superseding presentment by failing to raise them on direct appeal, see Tenn. Code Ann. § 40-30-106(g). In any case, the Petitioner is not entitled to relief on any of these claims.

A superseding presentment is a presentment obtained without the dismissal of a prior presentment. See State v. Harris, 33 S.W.3d 767, 771 (Tenn. 2000) (citing 41 Am. Jur. 2d Indictments and Informations § 54 (1995)); see also State v. Tonya Lea Chandley, No. E2006-02366-CCA-R3CD, 2007 WL 3379787, at *5 (Tenn. Crim. App. Nov. 15, 2007) (stating that indictments and presentments are "virtually identical in purpose"). The grand jury has "inquisitorial powers over—and shall have authority to return a presentment—of all indictable or presentable offenses found to have been committed or to be triable within the county." Tenn. R. Crim. P. 6(d). The duties of a grand jury include inquiring into, considering, and acting on all criminal cases submitted to it by the district attorney general, inquiring into any report of a criminal offense brought to its attention by a member of the grand jury, and reporting the results of its actions to the trial court. Tenn. R. Crim. P. 6(e). This power allows the grand jury to "act independently of a court and the district attorney by instituting a criminal action by virtue of a presentment." State v. Superior Oil, Inc., 875 S.W.2d 658, 661 (Tenn. 1994) (footnote omitted). The State is free to obtain a superseding presentment any time prior to trial without dismissing the pending presentment and may then select the presentment under which to proceed at trial. Cf. Harris, 33 S.W.3d at 771.

Despite the Petitioner's arguments to the contrary, a presentment is not required to be endorsed as a true bill in open court. See Martin v. State, 155 S.W. 129, 130 (Tenn. 1913); State v. Muzingo, 19 Tenn. 112, 113 (1838). Here, the record shows that the State obtained the superseding presentment after the trial court mistakenly determined that the original presentment was defective. Thereafter, the State elected to proceed under the superseding presentment at trial. Although the Petitioner asserts that the "plethora of

defects" in his original presentment "forbids the filing of a superseding presentment," we recognize that a superseding presentment is routinely utilized to correct a defect in an original presentment. See, e.g., State v. Missy Daniella Lane, No. E2017-01907-CCA-R3-CD, 2019 WL 4568053, at *14 (Tenn. Crim. App. Sept. 20, 2019). Accordingly, the Petitioner is not entitled to relief on these issues.

Moreover, while the Petitioner claims that "the superseding presentment [wa]s fatally defective in failing to inform [him] of alleged acts of underpayment after the period covered by the defective presentments," the record shows that at the time of trial the superseding presentment charged him with one count of money laundering that was committed during the period from February 24, 2011 to January 30, 2012, one count of theft of property valued at $60,000 or more that was committed during the period from February 24, 2011 to January 30, 2012, and twelve counts of sales tax evasion that were each committed on or about February 24, 2011, March 23, 2011, April 25, 2011, May 20, 2011, June 22, 2011, July 22, 2011, August, 22, 2011, September 22, 2011, October 24, 2011, November 22, 2011, December 27, 2011, and January 30, 2012. These were the only counts with which the Petitioner was charged and convicted. Although the Petitioner is perhaps referencing the trial court's admission of his subsequent act evidence under Rule 404(b), as explained below, this issue has been either previously determined on direct appeal or waived by the Petitioner's failure to present any evidence in support of this issue at the post-conviction hearing. In any case, the Petitioner is not entitled to relief on this issue.

Furthermore, the Petitioner asserts that because there was "a single, continuing tax evasion relative to only one complaint from the Tennessee Department of Revenue" that occurred over "twelve (12) transactions from January through December 2011, there can be only "one penalty." The record shows the Petitioner was charged with sales tax evasion under Code section 67-1-114(g), which provides, "It is a Class E felony for any person willfully to attempt in any manner to evade or defeat any tax due the state of Tennessee . . . . Each act done in violation of this subsection (g) is a separate offense." Because the Petitioner was required to pay sales tax each month to the state of Tennessee, each act of sales tax evasion that the Petitioner committed each month was properly charged as a separate offense.

Finally, the Petitioner claims that because the charged offenses of money laundering, theft, and tax evasion all occurred "within the same time frame," they constitute "one single criminal act[,]" and his convictions for all of these offenses violate double jeopardy. For the offense of money laundering, the State was required to prove that (1) the defendant knowingly used proceeds with the intent to promote, in whole or in part, the carrying on of a specified unlawful activity; (2) that the proceeds were derived directly or indirectly from a specified unlawful activity; and (3) that the defendant knew that the

- 26 -

property or proceeds were derived from some form of criminal activity. See Tenn. Code Ann. § 39-14-903; 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 11.36. For the offense of theft of property valued at $60,000 or more, the State was required to prove that (1) the defendant knowingly obtained or exercised control over property owned by the State of Tennessee; (2) the defendant did not have the owner's effective consent; and (3) the defendant intended to deprive the owner of the property. See Tenn. Code Ann. § 39-14-103; 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 11.01. Lastly, for the offense of tax evasion, the State was required to prove that the defendant willfully attempted in any manner to evade any tax due the State of Tennessee. See Tenn. Code Ann. § 67-1-1440(g). Even if the Petitioner's convictions arose from the same act or transaction, each of these offenses includes an element different from the other offenses, and no offense is a lesser included of the other. See State v. Watkins, 362 S.W.3d 530, 558 (Tenn. 2012). Because the Petitioner has failed to show that the offenses charged in the superseding presentment or his convictions violate double jeopardy, he is not entitled to relief.

C. **Grand Jury.** The Petitioner also raises the stand-alone issue that his rights to due process and equal protection were violated when African Americans were allegedly excluded from the Greene County grand jury that indicted him as well as the petit jury that convicted him. See Rose, 443 U.S. at 563-65 (holding that racial discrimination in selection of members of a state grand jury is cognizable in federal habeas corpus and will support issuance of a writ setting aside a conviction and ordering the indictment quashed, even where no constitutional impropriety tainted the selection of the petit jury and guilt was established beyond a reasonable doubt at a trial free from constitutional error). In support of this claim, the Petitioner argues that it was unconstitutional and racially discriminatory for Ronnie Metcalfe, a Caucasian Greene County resident, to serve as the grand jury foreperson for nearly thirty years, and he contends that Metcalfe's long-term appointment tainted the grand jury process as a whole. He also asserts that when Mr. Metcalfe passed away, his son, Ron Metcalfe, Jr. was automatically appointed as the next Greene County grand jury foreperson, which he claims is an example of "nepotism, racial bias, [and] racial discrimination" because there was no adherence to the appointment guidelines for forepersons."

Initially, we recognize that the Petitioner failed to raise this issue at trial or on direct appeal. In its order denying post-conviction relief, the court made the following findings of fact and conclusions of law regarding this claim:

> [The Petitioner] himself did not testify during the hearing and relied on legal arguments and other witnesses to make his points. [The Petitioner] argued that the grand jury was illegally constituted; however, he introduced no evidence to support such [an] accusation. . . .  The Court . . . finds no

evidence to support that the grand jury or [petit] jury were illegally constituted.

The Court finds that [the Petitioner] introduced no evidence that he was deprived of an impartial or appropriate jury.

We conclude that the Petitioner has waived this claim by failing to present this issue to the trial court or on direct appeal. See Tenn. Code Ann. 40-30-106(g); Mobley, 397 S.W.3d at 104. Waiver notwithstanding, the record fully supports the post-conviction court's findings and conclusions as to this claim. Although the Petitioner made various arguments regarding this issue at the post-conviction hearing, the Petitioner offered no evidence that African Americans were systematically excluded from his grand jury or his petit jury. Because the Petitioner failed to satisfy his burden of proving the factual allegations in his petition by clear and convincing evidence, he is not entitled to relief. See Tenn. Code Ann. § 40-30-110(f).

**D.** __Rule 404(b).__ The Petitioner argues that the trial court erroneously admitted evidence of other crimes, wrongs, or bad acts under Tennessee Rule of Evidence 404(b) that were not proven by clear and convincing evidence. He asserts that the court allowed the State to introduce "acts that were part and parcel of the very same investigation of alleged underpayments of taxes[,]" including "a statement taken at the Tennessee Revenue Office by Agent Brian McGhee" and the State's "Notice of Intent to Introduce Certified Records pursuant to Tennessee Rule of Evidence 902(11)."

On direct appeal, the Petitioner argued that the trial court erred in permitting the State to introduce certain subsequent act evidence pursuant to Tennessee Rule of Evidence 404(b), namely that he underpaid his sales tax in 2012 and 2013 after being warned by Agent McGhee in 2012 that he had previously failed to remit sufficient payments. See Jerry Reginald Burkes, 2018 WL 2194013, at *5. In considering this issue, the court held that this evidence was admissible to show that the Petitioner acted intentionally and that his failure to remit the proper amount of sales tax was not because of an accounting mistake or misunderstanding. Id. at *6. The court also held that Agent Mark See's testimony established this subsequent act evidence by clear and convincing evidence, that the probative value of this evidence outweighed the danger of unfair prejudice, and that the record did not support the Petitioner's claim that the admission of this evidence created a danger that the jury would include the amounts of the 2012 and 2013 assessments as part of the aggregated theft charge. Id.

We conclude that insofar as the Petitioner is attempting to relitigate the same Rule 404(b) issue he raised on direct appeal, this claim has been previously determined, see Tenn. Code Ann. § 40-30-106(h); Tenn. Sup. Ct. R. 28, § 2(E); see also Berry, 366 S.W.3d

- 28 -

at 170, and this court's opinion on direct appeal is the law of the case, <u>see</u> <u>Memphis Publ'g. Co.</u>, 975 S.W.2d at 306.

However, to the extent that the Petitioner is attempting to challenge the admission of different evidence at trial under Rule 404(b), we conclude that the Petitioner has waived this issue by failing to present any evidence regarding this claim at the post-conviction hearing, which resulted in the post-conviction court not ruling on this Rule 404(b) claim. <u>See</u> <u>Walsh v. State</u>, 166 S.W.3d 641, 645-46 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."). Moreover, although the Petitioner does not ask for plain error relief, the Tennessee Supreme Court has held that "'the plain error rule, which would otherwise permit an appellate court to address the issue sua sponte, may not be applied in post-conviction proceedings to grounds that would otherwise be deemed waived or previously determined.'" <u>Holland v. State</u>, 610 S.W.3d 450, 458 (Tenn. 2020) (quoting <u>Grindstaff</u>, 297 S.W.3d at 219). Waiver notwithstanding, because the Petitioner's Rule 404(b) claim is an evidentiary, rather than a constitutional issue, it is not a cognizable claim for post-conviction relief. <u>See</u> Tenn. Code Ann. § 40-30-103.

**E.  Sufficiency of the Evidence.**  Lastly, the Petitioner contends the evidence is insufficient to sustain his conviction for money laundering. He claims that the State failed to prove that he used proceeds "with the intent to conceal or disguise the nature, location, source, ownership, or control of the criminally derived proceeds." <u>See</u> Tenn. Code Ann. § 39-14-903(a)(1). He insists that there was no evidence presented at trial "suggesting that he knowingly used proceeds derived directly or indirectly from a specified unlawful activity," and that even if the funds used by him "had been derived from a specified illegal activity, which he does not concede, . . . an accused who simply use[s] the proceeds of illegal activity to purchase items is not guilty of money laundering."

We conclude that the Petitioner's challenge to the sufficiency of the evidence of his money laundering conviction has been previously determined, <u>see</u> <u>Jerry Reginald Burkes</u>, 2018 WL 2194013, at *9; Tenn. Code Ann. § 40-30-106(h); Tenn. Sup. Ct. R. 28, § 2(E); <u>see also</u> <u>Berry</u>, 366 S.W.3d at 170, and this court's opinion on direct appeal is the law of the case, <u>see</u> <u>Memphis Publ'g. Co</u>, 975 S.W.2d at 306. Moreover, issues regarding sufficiency of the evidence are not cognizable in post-conviction proceedings. <u>Cole v. State</u>, 798 S.W.2d 261, 264 (Tenn. Crim. App. 1990) ("It has long been established that issues concerning the sufficiency of the evidence . . . are not cognizable in post-conviction proceedings."). For these reasons, the Petitioner is not entitled to post-conviction relief.

## CONCLUSION

The judgment of the post-conviction court is affirmed.


_____
CAMILLE R. MCMULLEN, JUDGE